We move to the third case this morning, Lauderdale v. Illinois Department of Human Services. Mr. Ozerski? Thank you, Your Honor. My name is Don Ozerski, along with my co-counsel, Beth Riga. We represent Mayor Beth Lauderdale in this case. This case is an appeal from the United States District Court from the Central District of Illinois in the Springfield Division. The District Court erred in granting summary judgment for the defendants on both Ms. Lauderdale's equal pay claim and the Title VII claim, and we ask this Court to reverse the District Court's ruling and remand this case for trial. This case arose out of a factual situation, which is a bit unusual, but occurred in June 2000, or began in the Spring of 2010. Ms. Lauderdale, who currently held the position of Superintendent of the Illinois School for the Deaf, ISD, was asked to take a newly created position as dual superintendent of the ISD and the Illinois School for the Visually Impaired, ISBI. At the time of the events, the superintendent of the ISBI was a man named Reggie Clinton, who was earning $121,000 a year. Ms. Lauderdale, in her position as ISD, was earning $88,000 a year. The evidence is undisputed. Did it make any difference that she was acting superintendent rather than just the superintendent? Of the new position, Your Honor? No, of the old position. She was acting superintendent of the School for the Deaf, right? But I don't think that makes any difference, Your Honor, because the positions that should be compared here are not her position as School for the Deaf and her position as School for the Blind, but her new position as dual superintendent with Mr. Clinton's position as School for the Blind. So she was essentially asked to take a new position whereby she would be assuming 100% of Mr. Clinton's duties in her new position and retaining 100% of her old duties as head of ISD. When she was asked what it would take for her to take this position, she informally commented that, well, I would at least be need to pay as much as he was because I'm now doing two jobs, including his and my old one. Defendant Sadler responded that she did not think that would be a problem, and the defendant's actions at the outset of this case showed that no one thought it was going to be a problem. But the first step in the approval of the new position was approval of a CMS-104 designating the new position with a salary range of $51,000 to $126,000. Thereafter, Ms. Lauderdale was asked to submit a proposal, which she did, for $130,000, which was slightly higher than Mr. Clinton's salary, but reflected the additional duties and also the fact that she was entitled to a 5% bump for her bilingual skills in teaching the deaf. Ms. Lauderdale's direct supervisor, Defendant Kilbury, asked his assistant, Defendant Alvarado, to engage in negotiations with Ms. Lauderdale, and he did so, but it kept the other defendants informed through email and communication throughout the process. Alvarado initially refused Lauderdale's request for $130,000 and offered only a 5% increase over her existing salary. The defendants took the position that the pay plan only allowed for 5% raises. Counteroffers ensued, and discussion by Ms. Lauderdale that I'm being asked to do two jobs here. The total paid for those two jobs was approximately $200,000, and if you pay me the same salary as you paid Mr. Clinton to do the one job, there's still a huge savings here in the amount of $80,000 and change. Eventually, the negotiations went on into the summer, and it was in late July, close to the beginning of school, where Mr. Alvarado offered Ms. Lauderdale $101,000 plus the 5% bump for the bilingual education. She counted with $112,000. During this conversation, Ms. Alvarado told Mr. Lauderdale that Governor Quinn had specifically told him that she could not have received a salary higher than $106,500. Lauderdale was also told at this time that if she did not take the job, she would be demoted to an assistant superintendent position with a $12,000 to $14,000 annual reduction in pay. Given the fact that she was a single mother with three children, the school year was starting, and it would be impossible to find comparable employment at this late date, Lauderdale accepted on August 19, 2010. Under both the Equal Pay Act and Title VII, a valid comparison exists between Ms. Lauderdale's position as dual superintendent and Mr. Clinton's below, because she assumed 100% of his duties and had her own on top of that. The defendants have offered two defenses. The first of these is that a merit-based pay plan in place in the state of Indiana prohibited them from paying Lauderdale a salary equal to her male counterpart, Mr. Clinton. No evidence, however, has been designated to the court to indicate any portion of the pay plan... Did you say Indiana? I'm sorry, Illinois, that did not allow... There's a big difference between Indiana and Illinois when it comes to finances, particularly schools. I think you're correct, Your Honor. I think that's right. No evidence has been designated to the district court to show that the pay plan did not allow the defendants to pay Lauderdale a salary equal to her male comparator. On the contrary, the evidence shows that the defendants at first did not bother to follow the pay plan, and then even when they did follow parts of the pay plan, that did not prohibit them from paying her a salary equal to the person who was doing half her job. The defendant's HR director, Scott Vineyard, who's charged with administering the plan, testified that the pay plan would allow for an offer above 5% increase in salary upon completion of a decision memo, and then eventually a CMS-163 special salary request. The defendants never undertook to compile a decision memo, which would have required them to sign off on that salary to take it up the chain. They did eventually file a CMS-163, and what that shows is that no one, for a moment, thought that this 5% ceiling was at all meaningful. In the decision memo, which is in the record as Exhibit 18, record page 918, it shows that they requested and received a 37% increase. Now they only offered Ms. Lauderdale 18%, and that's what she eventually accepted because she was told by the governor that's all she could get. But it was approved, and the CMS-163 clearly shows that it was not considered a promotion. It was considered a new assignment, and that the 5% offered as an excuse was not a valid reason for that. Clearly, under the pay plan, many avenues exist to offer more than the 5%, particularly when it's a new position. For example, if one's a law clerk for the Attorney General's Office and one takes a position as an attorney, they're not going to only give you a 5% raise. It's a new position. It's a new salary structure. Here the pay plan allowed them to pay her a salary equal to her male counterpart, even when she was doing much more work. They didn't even offer the same salary as he was doing for twice the work. Is this the way this gets into sex discrimination? Yes, sir. Yes, Your Honor. And that's it? Yes, that's it. Because I don't see anything. I'm looking. You've got lots of budgetary problems. You've got lots of precedent about how much you can increase from one to another, et cetera, et cetera. Clinton had, I don't know how he got that high in the first place, but that's where he was. And that seems to be the only comparator that you're saying that she should have gotten his salary plus. Yes. I think, Your Honor, as opposed to most cases, this is the easiest comparator. A lot of cases you have people on the same level and you have different duties and you're trying to decide if they're equal. Here we know she did 100% of his duties. So it was certainly a valid comparator. Where did Clinton go? I'm sorry? Did he retire or something? He was resigning. And that goes to Your Honor's more recent question. The sex discrimination occurs in how she was treated as opposed with regard to these two offenses on the pay plan and the budgetary concerns as opposed to Mr. Clinton. It's undisputed that no one ever made a complaint that Mr. Clinton's $121,000 salary for doing half her job was a budget concern. Had he not chosen to resign or retire, there's no evidence that anything ever would have been done about that. So it's clear that she, as the woman, was being treated differently and the concerns that were being expressed were never expressed about the male comparator. Similarly, the district court made a point that Ms. Lauderdale's salary might be higher than her immediate superior, but once again, Mr. Clinton's salary was even higher and no one ever made a complaint about the male earning that amount of money for doing half the job. Was your superior male? Yes. The superior was male. Yes. All of the superiors were male until we get up to defendant's salary.  There was a lot of talk and surmise and rumor about potential problems, that there could be cuts, there could be school closings, but there's no actual evidence that this occurred. The defense of budget concerns comes in the catch-all provision for the Equal Pay Act or Title VII. There must be something in any of these defenses, both pay plan and budgetary concerns, to show that there was something binding or prohibitive on the decision maker, not simply that we do what I want. Here, there's no evidence, and defendant Stermer, who's from the governor's office, testified that the difference in her salary and Mr. Clinton's was minuscule compared to a several billion dollar budget. There was no budgetary concern to show that she couldn't be paid. They were still going to save $80,000. They should have just paid her what she asked for, which is what he paid, and they still would have had huge savings. This was a positive budget move, not a negative budget move. Help me understand how your argument fits with the Wersing v. Department of Human Services. Judge, in the Wersing case, the argument is that they were in differing jobs and they had different qualifications, and therefore their history, their pay history, about what they had received was different, and that gave rise to the decision and the disparity in salaries. But here, that's not the case, because in that case, the inference is that the pay plan prohibited that, and that's why that occurred. Here there's nothing that would have prohibited that. That's the point on this. Now, the only real evidence on the budget is the actions by the defendant in setting the salary structure at $51,000 to $126,000. What that tells us is the defendants in the state of Illinois said, we can pay $126,000 for this newly created dual position without having negative effects on the budget. Now, the budgetary concerns excused by its very nature must be broader than one employee. If they could have hired someone new and paid them $126,000 without a negative effect on the budget, then certainly they can pay their employee the same amount without having a negative effect on the budget. That's the only actual financial information that was taken by anyone in this case. Was there some discussion about actually eliminating these programs? There was. Even the schools? Yeah. There was some discussion, but once again, I think that is rumor and innuendo and there's no actual evidence that that occurred. I've seen a lot of that. That's why I'm just curious. That was one of the things that's been thrown around. Also with the governor's intervention. Right. And that shows us that could have been a political hot potato to get rid of those two schools like that. They each have their constituencies and that gives reason why the governor might be involved. But once again, the decision about whether they're going to be closed or cut, all of that takes place in the setting of the CMS 104 that says we will pay up to $126,000 for this position. That's when that decision making takes place. You're not going to, and Mr. Vineyard testified, we're not going to put $126,000 on there if we can't pay it. And that's the point. All of these budget decisions take place in the beginning and the defendant's actions at the time showed that they didn't think there was any reason not to be able to pay $126,000. Now the evidence here is that all of the defendants were involved. The governor directly and each of the defendants through email, sometimes verbal communication. Here the evidence is that she was treated differently because she was a woman. They had an opportunity to do a decision memo, which they did not do. They didn't follow the pay plan. They ignored the pay plan. They never thought it was a prohibiting factor contemporaneously at the time. The paperwork where they did do the special salary request, they got approved for $37,000. This 5% was meaningless. That's something they threw up because they themselves didn't like the idea that she might make more money. But they, the defendants, had never been upset about Mr. Clinton's salary for doing half the work. The reasonable inference there is that since they weren't upset with that, then why would they be upset with her for doing twice the work? How long did he have that salary, or do you know? I think he had it for three or four years, Judge. What happened is they have another plan in Illinois, which I call the cable TV plan, which says if you leave and come back, they'll pay you the higher salary that you have when you left. We'll treat you better than our actual employees. We'll pay you what the other one was paying. And that's how his salary got to where it was. Okay, so it wasn't because he was a man. That's what I'm looking at. This is the problem we have when we look at these things, is there are so many things that go into this decision, whether or not you're going to have a program, and the fact that she was kind of corralled into it, obviously, she needed the job. And so she has to take because she can't go somewhere else, and this is what happened. Your Honor makes a good point, and that's why we have the burden-shifting mechanism. This is 2010. This isn't 1970. You're not going to get a bunch of madmen sitting around talking about the length of the sentence or something like that. What we have to look at is within the process, is she being treated different than her male counterpart? And that's the evidence of sex discrimination. And here she was, because there was never any complaints about a male doing half the work. And the reasonable inference from that is enough for the fact finder to find that it met the requirements of Title VII and that a woman was being treated very differently than anyone else. I see my time is up. Thank you, Your Honor. Thank you, Counsel. Mr. Dozman? May it please the Court, I'm Assistant Attorney General Aaron Dozman, and I represent the defendants. This Court should affirm the judgment of the District Court, Lauderdale's salary was determined by the state's pay plan and its budget. Those are gender-neutral reasons that determined her salary, and for those reasons, the defendants were entitled to judgment as a matter of law on her sex discrimination claims. Lauderdale's position has focused entirely on the resulting pay disparity, but it has ignored the process and the context in which her salary was determined. On summary judgment, she failed to offer sufficient evidence to undermine the state's justifications or show that some other sex-based factor was at play. Using the pay plan, three factors are relevant to determine a candidate's salary. A prior salary, or the candidate's current salary, the percentage increase over that period, and the state's budget. The Department is authorized by itself to offer up to 5% over the prior salary. Reggie Clinton, when he came back to state service in 2008, he was making $118,000 in his prior job. His salary, when he came back in, was based off that prior salary, and he landed $121,000. His prior job was outside the government? Correct. Correct. Well, he was a superintendent at a local school district. And that explains how he landed that salary. In 2010, the Department gave its up to 5% offer, but she declined that. But they wanted to pay her above 5%, and there's a special salary request procedure for that. And that's what they did for Ms. Lauderdale. That special salary request procedure still takes into account the prior salary, the percentage increase over that prior salary, and ultimately it has to go all the way up to the Governor's Office and the Governor's Office of Management and Budget. And that's where final approval, that's where the final number comes from. Using that process, the Governor's Office decided that it was going to draw the line at about $100,000, and that's what it stuck with, which was roughly a 20% increase over her interim superintendent position, but it was a 37% increase over her original non-interim position. So that's why the CMS-163 form reflects both a 21% and a 37% increase. How many people were considered for this position? Lauderdale was the top choice, I know that. There was one other person mentioned for consideration, that's Jan Breen, and they also had two public postings for the position. Is that Jan, a man or a woman? Jan Breen, I assume, is a woman. Not necessarily, but that probably is. Yes. Lauderdale, though, was always, based on this record, was always the first choice, and they were trying to get her as much money as they could. But that number has to be limited by something in the Governor's Office, and it doesn't automatically mean that they have to pay her $121,000. In 2009, the state experienced a significant budget crisis. The state cut its agency's budgets across the board, and the School for the Deaf and the School for the Blind were no exception. The School for the Deaf faced closure in 2009-2011. They could not fill vacant positions, their operating budgets were cut, and they could not give raises to their employees. So it's in that context that the Governor's Office, making a budget policy decision, decided that $100,000, or roughly 21% increase, was all it was going to do, allocate to that position. Is that evidence of what was going on all around them? I understand how that might be circumstantial evidence that the budget played a role, but is there anything that somebody said or did that indicates that the budget concerns played a role in the decision to stop offering anything about this? I think the emails between the department's head, which was Defendant Michelle Sadler, and the Governor's Office, they put those concerns in writing in those emails. I encourage the court to see those emails. But I don't think it's undisputed that there, or that it's not undisputed that there was more money to go around at this time. Everyone was operating under budget constraints, and I think that's why frustrations were probably very high during that time. Everyone was feeling the budget squeeze at that point. That is the process and the context in which the salary was determined. On summary judgment, they did not offer sufficient evidence to say there was enough money in the budget or that some other inference of sex-based decisions were at play. They've pointed to three main things, I think, to show that the state didn't follow their own process or could have paid her more. The first is the CMS pay range. The second is this lack of a decision memo in the record. And thirdly, they cite to the savings that might have been realized with the dual superintendent position. With respect to the pay range, pay ranges are not budgets. They are determined without respect to any one particular agency's budget. They are determined by central management services, which is sort of the bureaucracy. The bureaucracy, it just makes sure that the T's are crossed, I's are dotted, and they are not a budget policymaking agency. They just process the paperwork. Budgets are determined by the governor's office and the governor's office of management and budget. They are the budget policymakers, and they are the ones that determined the salary number. The decision memo, that there is a lack of a decision memo in this case doesn't mean that one was not created. The state didn't have one to produce in discovery, but it's really an irrelevant piece of the puzzle because the decision was made to pay her above 5%. The decision memo is relevant only as a, it's created by the department to justify to the governor's office, to CMS, central management services, to everyone who needs approval, needs to approve the salary, that the department agrees it's justified, and here's the justification for it. And that justification is also stated on the CMS 163 form that's page 918 of the record. Everyone was on board that she needed to be paid more money. That decision was made to justify. That final number, however, is above the department's pay grade. The last thing about consolidating and saving money no matter what they did, the consolidation was in response to the budget crisis. That they were going to still follow the pay plan and pay her salary using the pay plan doesn't mean that there was all of a sudden money in the budget. The state across the board still had a budget problem. The school still faced closure in 2011. It still couldn't fill vacancies, it still couldn't pay raises for its employees. It didn't solve any budget problems sufficient that there was really money in the coffers to pay her the money she requested. Was this school confined to those disabilities or is it just part of a bigger school? School for the deaf and school for the blind are stand-alone boarding schools in Jacksonville, Illinois. That answers my question. Yeah. I think that if the department stopped at 5%, this case would end with Warrenson versus Department of Human Services. But that they opened the door to try to pay her more money doesn't mean that they necessarily had to go all the way up to $121,000. It doesn't mean that that money was in the budget at that time. And the decision was made by the budget policy decision makers in the governor's office that $100,000 was all they were going to allocate to that school's position. The court has no further questions. We ask that you affirm the judgment of the district court. Thank you. It seemed there weren't other, you mentioned maybe one other applicant, but she had very unique qualities. She had not only the dual language, but also the sign and all of that. She obviously was in kind of a class by herself, it sounds to me. Yes. At the school for the deaf, sign language was the second language. And that's why she got the pay bump. So I think it was a requirement. Now when you said that they're two separate entities, were they in different locations? They're both in Jacksonville. I think they're just on opposite, I think they have separate campuses. Oh, they do? Yeah. But they were going to... Well, in order to do both, I guess you got to be pretty close together. Yes. The design of the job was not a combination of two positions. We disagree with that characterization. It was no doubt a lot of work, but it was supposed to have a different reporting structure underneath the dual superintendent so that there would be a separate reporting process. But it wasn't simply a combination of those two. Thank you. I'll give you a minute. Briefly to respond to opposing counsel's argument. He makes it clear that this was a discretionary decision on that part. In that case, there's nothing in the budget that prohibited it. Therefore, where the district court erred is in weighing evidence, and we should be enough evidence to have a fact question on both the pay plan and the budgetary concerns so that the fact finder in this case could find whether those were viable defenses. It's clear that the governor is a viable defendant in this case, and the district court erred in that. Opposing counsel was quite clear that the governor's office was the one making the decision here. Finally, there's no evidence of any budgetary constraints on this particular position. There's a lot of rumor and supposition, but there's no one who came and said, here's the In fact, the CMS was the opposite. The decision, the defenses must contain some sort of non-discretionary item to be a meaningful defense. If it's simply we have budgetary concerns, we can do whatever we want to discriminate, that's not what's contemplated under the EPA or Title VII. Same thing with the pay plan. They say we have a pay plan. We can request more. We just didn't want to request as much as the mail. That's not what's contemplated. Thank you, Your Honor. We request that you reverse the district court and remand the case for trial on both Ms. Lauderdale's EPA claim and Title VII claim. Thank you. Thank you. Thanks to both counsel, and the case is taken under advisement.